## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
**JOSEPH J. RIMKUS,**                                )
)
**Plaintiff,**                             )
)
v.                                    )          **Civ. Action No. 06-1116 (RCL)**
)
**ISLAMIC REPUBLIC OF IRAN,** *et al.,*      )
)
**Defendants.**                          )
_____)

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action arises from the June 25, 1996, bombing at the Khobar Towers, a residence on a United States military base in Dhahran, Saudi Arabia. The plaintiff in this action is Joseph J. Rimkus, the father of deceased Airman First Class Joseph E. Rimkus ("Airman Rimkus" or "Joseph"), a serviceman killed in the attack. Plaintiff alleges that the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Iranian Islamic Revolutionary Guard Corps are liable for damages from the attack because they provided material support and assistance to Hezbollah, the terrorist organization that orchestrated and carried out the bombing. Plaintiff relies upon causes of action founded upon provisions of the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7).

This Court has already found these defendants liable for the death of Airman Rimkus. In *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.), this Court awarded damages to Airman Rimkus' surviving mother, Bridget Brooks, under the Florida Wrongful Death Act,[1] and to his two surviving

_____

[1]        Fla. Stat. Ann. §§ 768.16 *et seq.* (2005).

1

siblings, James Rimkus and Anne Rimkus, on theories of intentional infliction of emotional distress.  As plaintiff's claims were not addressed in *Heiser*, he has separately filed the instant action.

## PROCEDURAL HISTORY

In his Complaint, filed June 19, 2006, plaintiff named as defendants (1) the Islamic Republic of Iran ("Iran"); (2) the Iranian Ministry of Information and Security ("MOIS"); and (3) the Iranian Islamic Revolutionary Guard Corps ("IRGC").  Plaintiff sought damages for intentional infliction of emotional distress (Count I, against all defendants); solatium (Count II, against all defendants); and punitive damages (Count III, against defendants MOIS and IRGC).

On July 30, 2007, the defendants were served with the Complaint and all other required documents pursuant to 28 U.S.C. § 1608(a)(4).  This is reflected in a September 28, 2007, letter from the United States Department of State to the Clerk of this Court. (*See* Docket Entry # 13.)  Plaintiff thereafter sought entry of default on October 5, 2007, based upon defendants' failure to respond or enter an appearance.  Default was entered by the Clerk of this Court against all three defendants on December 4, 2007.

This Court held an evidentiary hearing in this matter on January 4, 2008.  At the outset of that hearing, plaintiff indicated that he was proceeding solely on the intentional infliction of emotional distress claim (Count I) against all three defendants, jointly and severally, with respect to compensatory damages.  With respect to punitive damages (Count III), plaintiff indicated that he was proceeding solely against the IRGC.  (*See* Hr'g Tr. 3–4, Jan. 4, 2008.)

At the hearing, this Court granted plaintiff's oral motion for the Court to take judicial notice of the related records and proceedings from other cases before this Court, including: *Heiser* and *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006).[2]  In those cases, this Court recognized defendants' liability for the Khobar Towers bombing.  (*See* Hr'g Tr. 6.)

Based on all of the evidence presented at the evidentiary hearing, the Court makes the following findings of fact and conclusions of law and will, consistent with them, enter default judgment in favor of plaintiff and against defendants Iran, MOIS, and the IRGC.

## FINDINGS OF FACT[3]

### I.    Generally

1.  In June 1996, Airman First Class Joseph Edward Rimkus was twenty-two years old, having been born on April 13, 1974.  (*See* Exs. 4 and 32.)  He was a citizen of the United States and was a member of the United States Air Force.  Although regularly stationed at Eglin Air Force Base in Florida, in June 1996, Joseph was on assignment in

---

[2]      Plaintiff moved into evidence the following certified transcripts of relevant testimony that was presented in *Heiser*:  Staff Sergeant Jerry Timothy Sasser, Jr. (Ex. 23); Lieutenant Colonel Thomas H. Shafer (Ex. 24); Technical Sergeant Alfredo Guerrero (Ex. 25); Technical Sergeant Selena P. Zuhoski (Ex. 26); Colonel Douglas R. Cochran (Ex. 27); former FBI Director Louis J. Freeh (Ex. 28); and Dale L. Watson, former CIA Deputy Chief for Counterterrorism and FBI Section Chief for all International Terrorism (Ex. 29).  Plaintiff also moved into evidence the certified transcript of the testimony of terrorism expert and former CIA Counterterrorism Bureau Officer Dr. Bruce Tefft, which was presented in *Blais*.  (Ex. 39.)  Additionally, plaintiff moved into evidence certified transcripts of testimony of Iranian government, politics, and economics expert Patrick L. Clawson, Ph.D, which was presented in *Bayani v. Islamic Republic of Iran*, Civil Action No. 04-1712 (D.D.C. hr'g held July 9–11, 2007) (Kennedy J.), (Exs. 30 and 54), as well as Dr. Clawson's sworn affidavit.  (Ex. 48.)

[3]      As noted above, this Court takes judicial notice of its prior findings of facts in *Heiser* and *Blais.*

Dhahran, Saudi Arabia, and resided in the Khobar Towers.  Joseph was part of the 58th

Fighter Squadron and had been trained as a weapons technician.  (*See* Ex. 32; Hr'g Tr.

45.)

2.   The Khobar Towers was a residential complex in Dhahran, Saudi Arabia,

which housed the coalition forces charged with monitoring Iraq's compliance with

United Nations Security Council resolutions enforcing the cease-fire that had brought an

end to the 1991 "Desert Storm" ejection of Iraqi occupying forces from Kuwait.  *Heiser*,

466 F. Supp. 2d at 252, ¶ 7 (citation omitted); *Blais*, 459 F. Supp. 2d at 47, ¶ 4 (citations

omitted).

3.   The deployment of U.S. troops to the region was considered a peacetime

deployment within a friendly host country.  *Heiser*, 466 F. Supp. 2d at 251, ¶ 3 (citation

omitted); *Blais*, 459 F. Supp. 2d at 47, ¶ 5 (citation omitted).

4.   Airman Rimkus, along with the other persons killed in the bombing, was

engaged in routine peace time operations while stationed in Saudi Arabia, and was

charged with enforcing the "no fly zone" in southern Iraq.  *Heiser*, 466 F. Supp. 2d at

251, ¶ 4.

5.   Defendant IRGC is a non-traditional instrumentality of Iran.  It is the military

arm of a kind of shadow government answering directly to the Ayatollah and the mullahs

who hold power in Iran.  It is similar to the Nazi party's SA organization prior to World

War II.  The IRGC actively supports terrorism as a means of protecting the Islamic

revolution that brought the Ayatollah to power in Iran in 1979.  It has its own separate

funding sources, derived in part from its confiscation of the assets of the former Shah of

Iran in 1979, when the Shah was deposed.  *Heiser*, 466 F. Supp. 2d at 251–52, ¶ 6; *Blais*, 459 F. Supp. 2d at 47, ¶ 11.

6.  Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) continuously since January 19, 1984."  *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 9, ¶ 19 (D.D.C. 1998) (Lamberth, J.).

**II.      The Attack on Khobar Towers**

7.  At approximately 10 minutes before 10:00 p.m. on June 25, 1996, a large gasoline tanker truck pulled up alongside the perimeter wall of the Khobar Towers complex.  The driver jumped out, ran into a waiting car that had pulled up near the truck, and sped off.  *Heiser*, 466 F. Supp. 2d at 252, ¶ 8; *Blais*, 459 F. Supp. 2d at 47, ¶ 13.

8.  Although security guards near the top of Building 131 started to give warnings about the unusual vehicle location, the truck exploded with great force within about 15 minutes.  The investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT.  The Defense Department said that it was the largest non-nuclear explosion ever up to that time.  *Heiser*, 466 F. Supp. 2d at 252, ¶ 9; *Blais*, 459 F. Supp. 2d at 47–48, ¶ 14.

9.  The explosion sheared off the face of Building 131, where Airman Rimkus and his crewmates were housed, and reduced most of it to rubble.  Nineteen United States Air Force personnel, including Airman Rimkus, were killed in the explosion, and hundreds of others were injured.  *Heiser*, 466 F. Supp. 2d at 252, ¶ 10; *Blais*, 459 F. Supp. 2d at 48, ¶ 15; *see* Exs. 32 and 60.

**III.      Iranian Support and Sponsorship of the Attack**

10.  The Khobar Towers attack was carried out by individuals recruited principally by a senior official of the IRGC, Brigadier General Ahmed Sharifi.  Sharifi, who was the operational commander, planned the operation and recruited individuals for the operation at the Iranian embassy in Damascus, Syria.  He provided the passports, the paperwork, and the funds for the individuals who carried out the attack.  *Heiser*, 466 F. Supp. 2d at 252, ¶ 11; *Blais*, 459 F. Supp. 2d at 48, ¶ 16.

11.  The truck bomb was assembled at a terrorist base in the Bekaa Valley that was jointly operated by the IRGC and by the terrorist organization known as Hezbollah. The individuals recruited to carry out the bombing referred to themselves as "Saudi Hezbollah," and they drove the truck bomb from its assembly point in the Bekaa Valley to Dhahran, Saudi Arabia.  *Heiser*, 466 F. Supp. 2d at 252, ¶ 12; *Blais*, 459 F. Supp. 2d at 48, ¶ 17.

12.  The terrorist attack on the Khobar Towers was approved by Ayatollah Khameini, the Supreme leader of Iran at the time.  It was also approved and supported by the Iranian Minister of Intelligence and Security at the time, Ali Fallahian, who was involved in providing intelligence security support for the operation.  Fallahian's representative in Damascus, a man named Nurani, also provided support for the operation.  *Heiser*, 466 F. Supp. 2d at 252, ¶ 13; *Blais*, 459 F. Supp. 2d at 48, ¶ 18.

13.  Under Louis Freeh, the FBI conducted a massive and thorough investigation of the attack, using over 250 agents.  *Heiser*, 466 F. Supp. 2d at 252, ¶ 14; *Blais*, 459 F. Supp. 2d at 48, ¶ 19.

14.  Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment on June 21, 2001, against 13 identified members of the pro-Iran Saudi

Hezbollah organization.  The indictment's description of the plot to bomb the Khobar

Towers complex frequently refers to direction and assistance from Iranian government

officials.  *Heiser*, 466 F. Supp. 2d at 252, ¶ 15; *Blais*, 459 F. Supp. 2d at 48, ¶ 20.

      15.  In addition, as a result of this investigation, the FBI also obtained a great deal

of information linking the defendants to the bombing from interviews with six admitted

members of the Saudi Hezbollah organization, who were arrested by the Saudis shortly

after the bombing.  These six individuals admitted to the FBI their complicity in the

attack on the Khobar Towers, and admitted that senior officials in the Iranian government

provided them with funding, planning, training, sponsorship, and travel necessary to

carry out the attack on the Khobar Towers.  The six individuals also indicated that the

selection of the target and the authorization to proceed was done collectively by Iran,

MOIS, and the IRGC, though the actual preparation and carrying out of the attack was

done by the IRGC.  *Heiser*, 466 F. Supp. 2d at 252–53, ¶ 16.

      16.  According to Director Freeh, the FBI obtained specific information from the

six about how each was recruited and trained by the Iranian government *in Iran* and

Lebanon, and how weapons were smuggled into Saudi Arabia from Iran through Syria

and Jordan.  One individual described in detail a meeting about the attack at which senior

Iranian officials, including members of MOIS and the IRGC, were present.  Several

stated that the IRGC directed, assisted, and oversaw the surveillance of the Khobar

Towers site, and that these surveillance reports were sent to IRGC officials for their

review.  Another told the FBI that the IRGC gave the six individuals a large amount of

money for the specific purpose of planning and executing the Khobar Towers bombing.

*Id*. at 253, ¶ 17.

17.  Louis Freeh has publicly and unequivocally stated his firm conclusion, based on evidence gathered by the FBI during its five-year investigation, that Iran was responsible for planning and supporting the Khobar Towers attack.  *Id.* at 253, ¶ 18; *Blais*, 459 F. Supp. 2d at 48, ¶ 21.

18.  Dale Watson was formerly the deputy counterterrorism chief of the FBI in 1996, and subsequently became the section chief for all international terrorism in 1997. Mr. Watson was responsible for day to day oversight of the FBI investigation of the Khobar Towers attack.  Mr. Watson has given sworn testimony that information uncovered in the investigation, "clearly pointed to the fact that there was Iran MOIS and IRGC involvement in the bombing." *Heiser*, 466 F. Supp. 2d at 253, ¶ 19; *Blais*, 459 F. Supp. 2d at 48, ¶ 22.

19.  Dr. Patrick Clawson testified at the *Heiser* trial as an expert in three areas: (1) the government of Iran; (2) Iran's sponsorship of terrorism; and (3) the Iranian economy. Dr. Clawson's expert opinion regarding the perpetrators of the Khobar Towers bombing is based on his involvement on a commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject.  *Heiser*, 466 F. Supp. 2d at 253, ¶ 20.

20.  Dr. Clawson testified that the government of Iran formed the Saudi Hezbollah organization.  He testified that the IRGC was responsible for providing military training to Hezbollah terrorists as to how to carry out a terrorist attack.  He also testified as to the state-sponsorship of terrorism, noting that at the time of the Khobar Towers bombing, Iran spent an estimated amount of between $50 million and $150 million on terrorist activities.  *Id.* at 253, ¶ 21.

21.  In light of all these facts, Dr. Clawson stated conclusively his opinion that the government of Iran, MOIS, and the IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction.  *Id*. at 253, ¶ 22.

22.  Dr. Clawson's expert opinions are supported by Dr. Bruce Tefft, whose expert opinion this Court adopted in *Heiser* and *Blais*.  *Heiser*, 466 F. Supp. 2d at 253–54, ¶ 23; *see Blais*, 459 F. Supp. 2d at 48, ¶ 23.  Dr. Tefft was one of the founding members of the CIA's counterterrorism bureau in 1985.  He served in the CIA until 1995, and has continued to work as a consultant on terrorism since that time, including work as an unofficial adviser to the New York Police Department's counterterrorism and intelligence divisions.  He retains a top-secret security clearance in connection with his work.  He has been qualified as an expert witness in numerous other cases involving Iranian sponsorship of terrorism.  *Id.*; *Blais*, 459 F. Supp. 2d at 48–49, ¶ 23.

23.  Dr. Tefft expressed the opinion that defendants Iran and the IRGC were responsible for planning and supporting the attack on the Khobar Towers, including providing operational and financial support.  He stated that there was "no question about it.  It wouldn't have happened without Iranian support."  *Heiser*, 466 F. Supp. 2d at 254, ¶ 24; *Blais*, 459 F. Supp. 2d at 49, ¶ 24.

24.  Dr. Tefft based his conclusion on publicly available sources that were not inconsistent with classified information known to him from his time at the CIA and from his security clearances since that time.  He relied on the public sources described above, as well as several others, which he described as authoritative and reliable, including congressional testimony by Matthew Levitt, senior fellow and director of the Washington

Institute's Terrorism Studies Program, and articles published by the Federation of American Scientists as well as the Free Muslims Coalition.  *Heiser*, 466 F. Supp. 2d at 254, ¶ 25; *Blais*, 459 F. Supp. 2d at 49, ¶ 25.

**IV.  Plaintiff's Relationship With Decedent Joseph E. Rimkus**

25.  Plaintiff Joseph J. Rimkus, Airman Rimkus' father, was seventeen years old when Joseph was born.  (Ex. 4.)

26.  At the time of Joseph's death on June 25, 1996, plaintiff was thirty-eight years old.

27.  Plaintiff served twenty years in the United States Air Force, and currently works as a satellite communications technician in support of special operations worldwide for the United States military.  (*See* Hr'g Tr. 32.)

28.  Plaintiff married Joseph's mother, Bridget Brooks, in October 1973, and they divorced in April 1991.  (*Id.* at 33.)  Plaintiff married his current wife, Janet Rimkus, in June 1997.  (*Id.*)

29.  Plaintiff was in the military at the time he married Bridget Brooks.  (*Id.* at 34; *see also* Ex. 4.)  He and Ms. Brooks had three children:  Joseph Rimkus, born April 13, 1974, James Rimkus, born September 12, 1975, and Anne Rimkus, born December 28, 1976.  *Heiser*, 466 F. Supp. 2d at 295.  Joseph was born at Keesler Air Force Base in Mississippi.  (*See* Ex. 4.)

30.  Plaintiff described the Rimkus family tradition of always naming the firstborn son of the previous firstborn son the same name, in this case "Joseph."  He also described the Rimkus family tradition of using the maternal grandfather's first name as the middle name of the firstborn.  Thus, Joseph was the ninth generation of "Josephs" in

the Rimkus family.  Joseph's middle name, Edward, was taken from his mother's father's name, Edward Bradley.  (*See* Hr'g Tr. 34.)

31.  Plaintiff introduced into evidence a photograph, taken around the Easter holiday in 1977, depicting four generations of "Joseph Rimkuses," namely, plaintiff Joseph James Rimkus, Joseph Frank Rimkus, Joseph Stanley Rimkus, and decedent Joseph Edward Rimkus.  (*See* Ex. 5; Hr'g Tr. 34–35.)

32.  Plaintiff and Joseph were extremely close, especially in Joseph's early years. Plaintiff testified that Joseph followed him "everywhere."  (Hr'g Tr. 35.)

33.  Plaintiff lived with Joseph and his wife at Keesler Air Force Base in Mississippi until plaintiff was transferred to Scott Air Force Base.  There, he and his family lived in an apartment, then moved to on-base housing at Scott Air Force Base. (*See id.* at 35.)

34.  In 1979, plaintiff took his family to Turkey, and, after several years, they moved to Crestview, Florida, where he was assigned to Eglin Air Force Base until 1989. (*See id.* at 36.)

35.  In 1989, plaintiff was stationed in Sonjong-ni, Korea, a village just outside of Kwangju Air Force Base in South Korea, and then in Guam.  Until that time, plaintiff always took his family with him on his military assignments.  (*See id.*)

36.  Plaintiff discussed photographs of himself receiving commendation medals during his tenures in Korea and Guam (1989–1991).  The photographs reflected his physical appearance as that of a man in very good physical shape.  (*See* Exs. 57 and 58.) Plaintiff testified that he weighed about 225 to 230 pounds at that time, and that since his

son's death, he has gained about eighty-five pounds, and now weighs 310 pounds.  (*See* Hr'g Tr. 37.)

37.  During the first year or so after his 1991 divorce from Ms. Brooks, plaintiff was stationed in the Pacific Rim and "was usually living in a tent somewhere," which hampered his ability to speak telephonically with his family.  As such, plaintiff was unable to speak with Joseph with any regularity.  (*See id.* at 38.)

38.  At the time of Joseph's high school graduation in 1992, plaintiff was stationed at Anderson Air Force Base in Guam.  (*See id.*)

39.  After his high school graduation, Joseph worked several jobs and went to college.  (*See id.*)

40.  In 1993, plaintiff retired in Ohio at Wright-Patterson Air Force Base and shortly thereafter moved to his mother's house in Edwardsville, Illinois, in an attempt to finish his engineering degree.  (*See id.* at 39.)

41.  Upon plaintiff's move to Illinois, he and Joseph became closer as father and son than they had ever been.  Joseph moved in with plaintiff, and planned on finishing his own college education.  (*See id.*)

42.  Plaintiff and Joseph worked on the same construction crew together, built houses together, and did finish carpentry together.  They spent most of their weekends doing chores around the house, working on plaintiff's mother's house, and barbecuing meals together.  Plaintiff and Joseph would run every night, and were both in excellent physical shape.  They also hiked quite a bit with their dog, a Great Dane.  (*See id.* at 39–40.)

43.   Plaintiff introduced several photographs of Joseph and him together in Illinois, taken sometime in 1994, including two pictures of them doing construction work together.  (*See* Exs. 6, 7, and 59.)  Plaintiff described these photographs as depicting a "typical day of work" for him and his son.  (*See* Hr'g Tr. 40.)

44.   They spent lots of time together planning, working, repairing their trucks, and the like.  (*See id.* at 40.)

45.   Joseph had an interest in the military from his childhood.  His father, plaintiff, and his paternal grandfather, had proudly served in the military.  (*See id.* at 42–43.)  At trial, plaintiff became emotional as he described Joseph's desire to serve in the military.

46.   Throughout his young adulthood, Joseph talked about the military continually, and in late 1994 or early 1995, Joseph decided to follow his father's footsteps and join the United States Air Force.  (*See id.* at 43.)

47.   Joseph enlisted in early 1995.  He spoke with plaintiff almost every weekend and also wrote letters to him.  (*See id.* at 45.)  A photograph of Joseph shortly after his enlistment sits atop plaintiff's piano in his home.  (*Id*. at 44.)

48.   Plaintiff introduced various letters and cards from Joseph, clearly demonstrating the strong father-son bond and love between them.  (*See* Exs. 9, 11, and 56.)

49.   In the Spring of 1996, Joseph was deployed to Saudi Arabia, with an expected return date of July 1996, literally days after his death.  (*See* Hr'g Tr. 47–48.)

50.   At the time that Joseph was deployed to Saudi Arabia, plaintiff was living in Kirkwood, Missouri, where Joseph visited him shortly before the deployment.  (*See id.* at

48.)  Plaintiff introduced a photograph of Joseph and him taken shortly before the deployment.  (*See* Ex. 55.)

51.  On June 23, 1996, two days before he was killed, Joseph and plaintiff spoke by telephone.  (*See* Hr'g Tr. 50.)  It was Father's Day.

52.  They discussed Joseph's concern about terrorism, as intelligence sources were expressing threats of bombings and other terrorist activity.  Joseph was thankful that he was so close to being able to return home.  (*Id.* at 50.)

53.  On June 17, 1996, Joseph sent plaintiff his last Father's Day card before his death.  (*See* Ex. 11; Hr'g Tr. 52–53.)  At trial, as plaintiff read Joseph's handwritten words from the card, "I love you, Dad.  I don't say that often enough," plaintiff broke down into tears.  (*See* Hr'g Tr. 52–53.)

54.  In his home in Florida, plaintiff has created a memorial to his lost son.  (*See* Ex. 15; Hr'g Tr. 56–57.)  The memorial includes a hardwood flag case containing the United States flag that draped his son's coffin, as well as all of his medals; a framed photograph of Joseph and his siblings as youngsters; his favorite baseball bat; one of his favorite tee shirts; a tee shirt bearing his unit emblem; a street sign reflecting "Rimkus Drive," created in his honor at Scott Air Force Base; a painting done by Joseph in high school (*see* Ex. 19); shell casings from the 21-gun salute at his funeral; and a checkered pilot scarf worn by pilots in his unit.  (*See* Hr'g Tr. 57–58.)

55.  Plaintiff also keeps scrapbooks in memory of his son, containing, *inter alia*, newspaper articles and photographs.  (*See id.* at 58.)

56.  In addition to Joseph's burial service in Florida, plaintiff had a memorial service for Joseph in Illinois.  (*See id.* at 59; Ex. 20.)  Plaintiff also had a grave marker

made for Joseph, which is an exact duplicate of the one made for plaintiff's father's grave.  The grave marker was placed near plaintiff's father's grave.  (*See* Exs. 21 and 22; Hr'g Tr. 60.)

57.  Plaintiff had his son's grave marker engraved with the words:  "Sleep, hero, sleep.  Your deeds shall never die."  (Hr'g Tr. 61.)

## V.   Impact of Joseph's Death on Plaintiff

58.  In the wake of his son's tragic death, plaintiff developed various ailments, including allergies and asthma, increased blood pressure, heart problems, and severe weight gain.  (*See id.* at 61–62.)

59.  Plaintiff testified that prior to his son's death, plaintiff remained physically active and had never been overweight.  (*See id.* at 62.)

60.  Plaintiff and Joseph planned to attend a fly fishing school together, to build a family construction business, and to one day spend time with Joseph's children—that is, plaintiff's would-be grandchildren.  (*See id.*)

61.  Since his son's death, plaintiff is less outgoing, and has a hard time being positive.  When his wife pulls out photographs of Joseph, plaintiff becomes frightened and angry.  (*See id.* at 62–63.)

62.  Plaintiff had dreams of Joseph getting married one day and having children. (*See id.* at 63.)  Plaintiff feels "angry," "disappointed," and "crushed" to think that the nine generations of Joseph Rimkuses as firstborns has ended.  (*Id.*)

63.  Plaintiff explained another family tradition that ended with Joseph's death. There was a diamond ring that came from Russia with plaintiff's great-great-grandfather, and as the last Joseph Rimkus died, before the coffin was closed, the decedent's mother

or wife would remove the ring and put it on the hand of the next generation.  (*See id.*)

When Joseph died, plaintiff considered having the ring buried with him.  (*See id.* at 64.)

64.  Plaintiff's wife, Janet Rimkus, testified about the impact of Joseph's death upon plaintiff.  She testified that even today, more than eleven years after his son's death, plaintiff remains very angry and "lost."  (*Id.* at 73.)

65.  Janet Rimkus emphasized that plaintiff and Joseph "grew up together," given their seventeen-year difference in age.  (*Id.* at 74.)

66.  Every anniversary of Joseph's death or birthday, plaintiff gets very quiet, and "pulls back."  (*Id.* at 77.)

67.  Dr. Dana Cable, a licensed psychologist and expert in thanatology—the study of death, dying, and bereavement testified as an expert for plaintiff regarding the psychological impact of Joseph's death on plaintiff.  (*See* Cable Dep., Dec. 11, 2007).

69.  Dr. Cable explained that due to the circumstances of his son's untimely death at the hands of terrorists, plaintiff remains in the "loss and loneliness" stage of grieving, which typically lasts one to two years.  Suddenness of loss, strength of attachment, potential of the deceased, unfinished business, and the manner in which the person dies, all contribute to the duration of this stage of grieving.  (*See id.* at 14:9–16:21.)

69.  Dr. Cable also attributed plaintiff's continued substantial grief to Joseph having been plaintiff's firstborn—the one to whom he was very close, with whom he worked and took classes.  They were very involved in each other's lives.  (*See id.* at 17:13–16.)

70.  The manner in which Joseph died—at the hands of terrorists not targeting Joseph personally, but rather what he represented—increases plaintiff's grief.  Moreover,

a surviving family member of a terrorist attack victim can never escape the tragic event, as it remains in the media, and is observed each anniversary. With the ongoing terrorist activities in the news, plaintiff is constantly reminded of his own loss at the hands of terrorists. (*See id.* at 18:5–19:2.)

70. Dr. Cable opined that Joseph's death has "totally altered" plaintiff's life. (*Id.* at 24:7.) He has become "emotionally reclusive," and gets angry very easily over minor things that never before would have bothered him before. (*Id.* at 25:8–12.)

72. Dr. Cable recommends that plaintiff needs counseling, and may never get over the loss of his son. (*See id.* at 26:15–27:4.)

73. Based upon all of the evidence presented, as well as the Court's own observations during the trial in this matter, the Court has no doubt that plaintiff has suffered, and will continue to suffer, extreme emotional distress over the loss of his son Joseph at the hands of the defendants.

## CONCLUSIONS OF LAW

### I.      Legal Standard for FSIA Default Judgment

Under the Foreign Sovereign Immunities Act, no judgment by default shall be entered by a court unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003), *cert. denied*, 542 U.S. 915 (2004). In FSIA default judgment proceedings, plaintiffs may establish proof by affidavit. *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (Urbina, J.). Upon evaluation, the court may accept plaintiffs' uncontroverted evidence as true. *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 255 (D.D.C. 2006) (Lamberth, J.) (citing

*Campuzano*, 281 F. Supp. 2d at 268). This Court accepts the uncontested evidence and sworn testimony submitted by plaintiff as true in light of defendants' failure to object or enter an appearance to contest the matters in this case.

## II.   Jurisdiction

The Foreign Sovereign Immunities Act is the sole basis for jurisdiction over foreign sovereigns in the United States. *See Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434 (1989). The "state-sponsored terrorism" exception provides that a foreign sovereign will not be immune to suit in U.S. courts where:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7).

In order to subject a foreign sovereign to suit under 28 U.S.C. § 1605(a)(7), plaintiffs must demonstrate that (1) the foreign sovereign was designated by the State Department as a "state sponsor of terrorism;" (2) the victim or claimant was a U.S. national at the time the acts took place; and (3) the foreign sovereign engaged in conduct that falls within the ambit of the statute. *Heiser*, 466 F. Supp. 2d at 254.

Each of the requirements is met in this case. First, defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time of the attack. *See* 31 C.F.R. § 596.201 (2001); *Flatow*, 999 F. Supp. 1, 11 (D.D.C. 1998) (Lamberth, J.). Second, both plaintiff and his deceased son were United States nationals at the time of the attack. Finally, defendant Iran's support of an

entity that committed an extrajudicial killing squarely falls within the ambit of the statute. Defendants MOIS and the IRGC are considered to be a division of state of Iran, and thus the same determinations apply to their conduct. *Roeder*, 333 F.3d at 234. Personal jurisdiction exists over a non-immune sovereign so long as service of process has been made under Section 1608 of the FSIA. *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.). In this case, service of process has been made. Accordingly, this Court has *in personam* jurisdiction over defendants Iran, MOIS, and IRGC.

## III.   Liability

### A.   Judicial Notice of Findings and Conclusions in *Blais* and *Heiser*

Plaintiff asserts that the Court should take judicial notice of the facts and conclusions made by this Court in its consideration of the matters of *Heiser* and *Blais*, actions that were brought against the same defendants for damages resulting from the same 1996 attack on the Khobar Towers. Indeed, *Heiser* involved claims brought specifically in connection with the death of Airman Rimkus, by surviving family members other than plaintiff. A court may take judicial notice of related proceedings and records in cases before the same court. *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005) (Bates, J.). As Judge Bates noted in *Salazar*, under Federal Rule of Evidence 201(e), a "party opposing judicial notice of a given fact must be afforded an opportunity to be heard . . . and may certainly make recognized objections to the admissibility of such judicially noticed facts as evidence in the case." *Id.* (internal citations omitted). Defendants in this case have failed to make such objections, or even make an appearance at all before this Court. Accordingly, in addition to the unopposed trial submissions made by plaintiff in this

matter, this Court will take judicial notice of the findings made in *Heiser* and *Blais* as to the defendants' involvement in and liability for the Khobar Towers bombing.

In *Blais*, this Court found as fact that the Khobar Towers attack was carried out by individuals who referred to themselves as the group "Saudi Hezbollah." *Blais*, 459 F. Supp. 2d at 48. The Court found that these individuals were recruited by Brigadier General Ahmed Sharifi, a senior official of the IRGC. *Id.* General Sharifi planned the operation, and recruited the individual members of Saudi Hezbollah at the Iranian Embassy in Damascus, Syria. *Id.* He was also responsible for providing the funds, passports, and paperwork for the individuals who carried out the attack. *Id.*

In addition to acknowledging General Sharifi's involvement in the attack, this Court found that the attack was approved by the Ayatollah Khameini, Iran's Supreme Leader at the time, and was approved and supported by Ali Fallahian, the head of MOIS at the time. *Id.* This Court also found that Mr. Fallahian's representative in Damascus, Syria, a man by the name of Nurani, provided additional direct support for the operation. *Id.*

This Court heard testimony from and accepted documentary evidence considered by Dr. Bruce Tefft.[4] Dr. Tefft expressed his opinion "that defendants the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on the Khobar Towers, including providing operational and financial support." *Blais*, 459 F. Supp. 2d at 49.

Dr. Tefft's testimony and the evidence accompanying his testimony are consistent with the testimony and evidence from *Blais*, including testimony given by Mr. Freeh. In fact, Dr. Tefft not only relied upon the conclusions put forth by Messrs. Freeh and Watson in forming his own

---

[4]         *See supra* Findings of Fact, ¶ 22.

opinion in this matter, but Dr. Tefft stated that he agreed with their conclusions regarding the connection between Iran and Saudi Hezbollah in bringing about the bombing of the Khobar Towers.  When asked as to the defendants' involvement in the attack, Dr. Tefft stated that there was "no question about it.  It wouldn't have happened without Iranian support." *Id.*

Finally, this Court considered written testimony from both former FBI Director Louis Freeh and former Deputy Counterterrorism Chief Dale Watson.  In his written statement, Director Freeh stated that, based upon his involvement in the FBI's five year investigation into the attack on the Khobar Towers, Iran was responsible for supporting and funding the attack.  *Blais*, 459 F. Supp. 2d at 48.  Mr. Dale Watson likewise stated unequivocally that, based upon information uncovered in the investigation into the attack, there was Iranian, MOIS, and IRGC involvement in the bombing.  *Id.*  As in *Heiser*, the Court found the conclusions of Messrs. Freeh and Watson in *Blais* to be amply reliable and probative as to the question of the defendants' involvement in the Khobar Towers bombing.

Accordingly, having considered the evidence and testimony admitted at the evidentiary hearing in the present case, this Court finds that plaintiff has met his burden under the state-sponsored terrorism exception of the FSIA by establishing his right to relief "by evidence that is satisfactory to the Court."  The totality of the evidence at trial, combined with the findings and conclusions entered by this Court in *Blais* and *Heiser*, firmly establishes that the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran, the IRGC had the responsibility and worked with Saudi Hezbollah to execute the plan, and the MOIS participated in the planning and funding of the attack.

### B.    Proper Causes of Action under the FSIA

Section 1605(a)(7) is "merely a jurisdiction-conferring provision that does not otherwise

21

provide a cause of action against either a foreign state or its agents." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032 (D.C. Cir. 2004).  Once a foreign state's immunity has been lifted under § 1605 and jurisdiction is proper, § 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law.  *See Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8–10 (D.D.C. Mar. 29, 2005) (Bates, J.).

In this case, state law provides a basis for liability.  First, the law of the United States applies rather than the law of the place of the tort or any other foreign law.  This is because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens.  *Id.* at *20.

This Court must next determine which state's law to apply.  As the forum state, District of Columbia choice of law rules guide the Court's analysis.  Under District of Columbia choice of law rules, courts employ a refined government interest analysis under which courts "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review."  *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted).  This test typically leads to the application of the law of plaintiff's domicile, as the state with the greatest interest in providing redress to its citizens.  *See Dammarell*, 2005 WL 756090, at *20–21.  Accordingly, plaintiff's claims shall be governed by his domicile at the time of the attack, Missouri.  (*See* Hr'g Tr. at 48.)

## C.     Vicarious Liability

The basis of defendants' liability is that they provided material support and resources to Saudi Hezbollah, which personally completed the attack. One may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting, and inducement. This Court finds that civil conspiracy provides a basis of liability for defendants Iran, MOIS, and the IRGC.

A claim for civil conspiracy exists under Missouri law where (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) the plaintiff was thereby damaged. *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. 1996).

As this Court has previously held, "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 84 (D.D.C. 2006) (Lamberth, J.) (quoting *Flatow*, 999 F. Supp. at 27). It is undisputed that Saudi Hezbollah committed the attack on the Khobar Towers.

In addition, it has been established by evidence satisfactory to this Court that Saudi Hezbollah and defendants Iran, MOIS and the IRGC conspired to commit the terrorist attack on the Khobar Towers. *Blais*, 459 F. Supp. 2d at 55. The evidence shows that senior Iranian, MOIS and IRGC officials participated in the planning of, and provided material support and resources to Saudi Hezbollah for the attack on the Khobar Towers, including providing financing, training and travel documents to facilitate the attacks. *Id.* The evidence also shows that Saudi Hezbollah, Iran, MOIS and the IRGC reached an understanding to do an unlawful act, namely the murder and maiming of American servicemen. Moreover, the sheer gravity and nature of the attack demonstrate that the defendants also intended to inflict severe emotional distress upon the American servicemen as well as their close relatives. *Id.* The financing, training and providing of

travel documents ably satisfy the act requirement for civil conspiracy under Missouri law.  Finally, as will be discussed below, plaintiff Joseph Rimkus, through the loss of his son, has clearly suffered damages as a result of the conspiracy.  Accordingly, the elements of civil conspiracy under Missouri law are established between Saudi Hezbollah and defendants Iran, MOIS, and the IRGC.

### D.       Plaintiff's Claim for Intentional Infliction of Emotional Distress

Count I of the Complaint alleges claims for intentional infliction of emotional distress. (Compl. ¶¶ 21–26.)  Missouri law recognizes the existence of a cause of action for intentional infliction of emotional distress, rooted in Section 46 of the Restatement (Second) of Torts.  *See Peterson*, 515 F. Supp. 2d at 41 n.9 (citing *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. 1993).  To state a claim of intentional infliction of emotional distress under Missouri law, a plaintiff must plead extreme and outrageous conduct by a defendant who intentionally or recklessly caused severe emotional distress that resulted in bodily harm.  *Nazeri*, 860 S.W.2d at 316.  Furthermore, Missouri permits third party plaintiffs to recover for intentional infliction of emotional distress where, as here, the defendant's conduct is "directed at" the third party plaintiffs themselves.  *Peterson*, 515 F. Supp. 2d at 44.  As this Court has previously found, "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."  *Heiser*, 466 F. Supp. 2d at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)).

Based upon the evidence presented, the elements of plaintiff's claim for intentional infliction of emotional distress are met.  In *Heiser*, this Court found that the defendants' conduct in facilitating, financing, and providing material support to bring about the Khobar Towers bombing was intentional, extreme, and outrageous conduct by the defendants.  466 F. Supp. 2d at 286, 298;

*see also Blais*, 459 F. Supp. 2d at 56–57.  Indeed, defendants provided material support to Saudi Hezbollah with the intent that the latter would carry out attacks that would cause severe emotional distress.  Defendants' conduct, in facilitating and supporting the Khobar Towers bombing, proximately caused plaintiff's emotional distress.  Finally, it is abundantly clear to this Court that plaintiff has suffered—and will likely continue to suffer—severe emotional distress as a result of his son's tragic and untimely death.

Accordingly, this Court concludes that plaintiff has "establishe[d] his claim or right to relief by evidence satisfactory to the court," and is therefore entitled to the entry of a default judgment against defendants.  28 U.S.C. § 1608(e); *see Roeder*, 333 F.3d at 232.

### C.     Damages

#### 1.     Compensatory Damages

As a result of the wrongful conduct of defendants Iran, MOIS, and the IRGC, plaintiff has suffered pain and mental anguish.  Under the FSIA, if a foreign state may be held liable, it "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  Accordingly, plaintiff is entitled to the typical bases of damages that may be awarded against tortfeasors under the laws under which his claim is brought.

In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium.  *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.).  "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress."  *Id.*

25

Families of victims who have died are typically awarded greater damages than families of victims who remain alive. *Heiser*, 466 F. Supp. 2d at 269. While the loss suffered by plaintiff in this case is undeniably difficult to quantify, courts typically award approximately $5 million to a parent whose child was killed. *Id.* (citation omitted).

As described above, Dr. Dana Cable—a licensed psychologist, a certified death educator, and a certified grief therapist—testified as an expert for plaintiff concerning the impact of Joseph's death on plaintiff, and the grief process and factors which cause it to be more extensive and intensive for plaintiff. (*See* Cable Dep. 12:20–16:20.) Dr. Cable opined that Joseph's death has "totally altered" plaintiff's life. (*Id.* at 24.) He further attributed the decline in plaintiff's physical health to his son's death. (*See id.* at 24:8–12.) Dr. Cable recommended that plaintiff seek grief counseling, and recognized that plaintiff may never get over the loss of his son. (*Id.* at 26:13–27:4.)

The Court also made its own observations of plaintiff during trial. His sadness, grief and emotional anguish overwhelmed him at times. This was especially true when he spoke about receiving his last Father's Day card from Joseph, and about Joseph representing—due to his untimely death—the last of nine generations of firstborn Rimkuses named "Joseph," signifying the end of a centuries-long family tradition. He left the courtroom when his wife, Janet Rimkus, testified about her observations of plaintiff in the wake of his son's death. Plaintiff's sadness was mixed with a great sense of pride in his son for following in his father's, and his grandfather's, footsteps of proud service in the United States military. He wept as he described the granite grave marker in Joseph's memory, which lies adjacent to plaintiff's father's matching grave marker in Illinois. He also became very emotional when describing the memorial that he created in his home in memory of Joseph.

Based upon the evidence presented at trial, plaintiff has experienced severe emotional anguish and suffering as a result of his son's untimely death.  Therefore, this Court shall award plaintiff compensatory damages in the amount of $5 million to compensate him for such severe emotional pain and suffering.

### 2. Punitive Damages

In addition to seeking compensatory damages against the defendants, plaintiff also seeks punitive damages against the IRGC.  As a general rule, punitive damages are not available against foreign states.[5]  28 U.S.C. § 1606; *Heiser*, 466 F. Supp. 2d at 270; *Blais*, 459 F. Supp. 2d at 60. Additionally, punitive damages are not available "against divisions of a foreign state that are considered to be the state itself, instead of an agent or instrumentality thereof."  *Heiser*, 466 F. Supp. 2d at 270 (citations omitted).  The D.C. Circuit has established a categorical approach for determining if an entity should be considered the foreign state itself for the purposes of the FSIA: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state."  *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003).  As agencies or instrumentalities of the foreign state, commercial entities are subject to punitive damages under the FSIA.  *See Heiser*, 466 F. Supp. 2d at 270.  The plaintiff bears the burden of proving that the entity is commercial.  *Id.*

Plaintiff argues that the core function of the IRGC is commercial, and therefore it is merely an agency or instrumentality of the state and is subject to punitive damages.  In previous actions,

---

[5]  The recently enacted National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110-181, 122 Stat. 3, § 1083, revised the terrorism exception to sovereign immunity by repealing § 1605(a)(7) of Title 28 and replacing it with a separate section, § 1605A.  Under that provision, punitive damages are now available against a foreign state that is or was a state sponsor of terrorism.  Plaintiff does not, however, assert a cause of action under § 1605A.  As such, this Court maintains jurisdiction under § 1605(a)(7), *see Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C. Cir. 2008), which does not permit this Court to award punitive damages against foreign states or divisions thereof.

this Court has repeatedly declined to award punitive damages against the IRGC finding that, under *Roeder*, the IRGC is governmental rather than a commercial entity.  *See Heiser*, 466 F. Supp. 2d at 270–71 (concluding that there was insufficient evidence to determine that the IRGC is commercial); *Blais*, 459 F. Supp. 2d at 60–61 (same); *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 162 (D.D.C. 2006) (Lamberth, J.) (finding no evidence that the IRGC's functions are commercial rather than governmental); *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 32–33 (D.D.C. 2005) (Kollar-Kotelly, J.) (declining to award punitive damages but acknowledging that the IRGC "appears to be a true 'instrumentality' of the dominant party of the state, used by the government and its officials in largely 'illegal,' paramilitary, and *sub rosa* activities"); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005) (Bates, J.) (recognizing that "the IRGC does not easily fit into *Roeder*'s dichotomy" but determining that the IRGC is more like an "armed force" than a commercial agency or instrumentality of the state); *Welch v. Islamic Republic of Iran*, Civ. A. No. 01-863, 2004 WL 2216534, *5 (D.D.C. Sept. 27, 2004) (Kay, Mag. J.) (finding that the IRGC's core functions were analogous to those of MOIS); *but see Bayani v. Islamic Republic of Iran*, 530 F. Supp.2d 40, 46 (D.D.C. 2007) (Kennedy, J.) (awarding punitive damages against the IRGC in the amount of $400 million).  In those cases, plaintiffs' attempts to obtain punitive damages against the IRGC failed because plaintiffs lacked affirmative evidence that the IRGC's core functions are commercial.  For the reasons explained below, the evidence submitted in the instant case of the IRGC's commercial activities—while more detailed than in earlier cases—remains insufficient for this Court to reach the conclusion that the IRGC is a commercial entity.

Plaintiff presented evidence that the IRGC, in addition to its paramilitary function, is engaged in a host of commercial activities. Specifically, Dr. Clawson, in a December 21, 2007 affidavit, described the following:

> The IRGC runs a large number of commercial activities, including engineering businesses, smuggling operations, and commercial activities in the oil and gas sector. For example, one of the IRGC's firms has been awarded contracts worth billions of dollars by governmental agencies and the National Iranian Oil Company. By further way of example, the IRGC engages in widespread smuggling activities involving Iran and Iraq. These smuggling activities include, but are not limited to, drug smuggling and alcohol smuggling.

(Clawson Aff. ¶ 44.)

Similarly, Dr. Clawson testified at a July 10, 2007 evidentiary hearing in *Bayani* that the IRGC engages in extensive smuggling of drugs and other contraband, and that proceeds of these activities are used "for financing the Revolutionary Guard Corps" and to "financ[e] the individuals [within the IRGC leadership] and their lifestyles." (Hr'g Tr. 27, July 10, 2007.) Plaintiff also introduced into evidence the sworn affidavit of Mohsen Sazegara, one of the founders of the IRGC and a former press aide to Ayatollah Ruhollah Khameini. (*See* Sazegara Aff.) In his affidavit and article, Mr. Sazegara states that the original purpose of the IRGC was to serve as a lightly armed militia or "people's army" that would insulate the country from potential coups during peacetime, and fight alongside the regular military in times of war. (*Id.* at ¶ 20.) Mr. Sazegara described the evolution of the IRGC since the 1980s from a national guard to "an organized crime syndicate" controlling "more than 100 different economic enterprises." (*Id.* at ¶¶ 21, 26.) Plaintiff's evidence further shows that the IRGC bolsters its profits by using its power of intimidation and force to run smuggling operations and other illegal activities. (*Id.* at ¶ 28.)

While the evidence demonstrates that the IRGC actively engages in commercial activities—albeit in come cases, illicit activities—there is insufficient evidence for this Court to conclude that the IRGC's *core function* is commercial, thereby subjecting it to punitive damages.

Dr. Clawson continues to define the IRGC as "the striking arm of the revolution" operating "parallel to the formal government structure."  (Clawson Aff.  ¶¶ 38–39.)  Indeed, there is no evidence from any expert that the IRGC has abandoned its role as a paramilitary organization in favor of becoming a primarily commercial entity.  While Dr. Clawson's more recent testimony demonstrates evidence of commercial activities performed outside of the IRGC's paramilitary function, he does not affirmatively renounce his previous testimony in *Heiser* that the mission of the IRGC "is to provide ideologically sound military force."  (*See* Hr'g Tr. 28, Feb. 9. 2004.)  That said, this Court has no doubt, based upon the evidence presented, that the IRGC uses its status as a paramilitary organization to advance its pecuniary interests.  But such conduct—even if criminal in nature—does not render the IRGC a commercial entity under the standard set forth by this Circuit in *Roeder*.  Rather, it is this Court's conclusion that the IRGC's core function relates primarily to its role as a paramilitary force.  Accordingly, plaintiff's claims for punitive damages must be denied.

## CONCLUSION

This Court takes note of plaintiff's courage and steadfastness in pursuing this litigation and his efforts to take action to deter more tragic suffering of innocent Americans at the hands of terrorists.  His efforts are to be commended.

A separate Order and Judgment consistent with these findings shall issue this date.

SO ORDERED.


Signed by Royce C. Lamberth, Chief Judge, on August 26, 2008.